UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIMOTHY A. WOODHAMS,
*individually and on behalf of all others
similarly situated, et al.*,
                                    Plaintiffs,

                    -v-

GLAXOSMITHKLINE CONSUMER
HEALTHCARE HOLDINGS (US) LLC,
                                    Defendant.

18-CV-3990 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

On behalf of themselves and a putative nationwide class, Timothy A. Woodhams, John

Covello, Cynthia Carrillo, Oscar De Leon, Daniel Paul, Robert Trepper, and Daniel Utterback

(collectively "Plaintiffs") bring consumer protection and unjust enrichment claims against

Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC[1] for charging more for

"Maximum Strength" Robitussin cough syrup than for "Regular Strength" Robitussin cough

syrup, even though the former had a lower concentration of active ingredients per bottle than the

latter. Defendant previously filed a motion to dismiss. In a prior opinion, the Court dismissed

the unjust enrichment claims of Plaintiffs Covello, Paul, and Woodhams, and denied the motion

with respect to these seven Plaintiffs' remaining claims.[2] Defendant now moves for summary

judgment (ECF No. 102), and Plaintiffs move for class certification (ECF No. 91). In addition,

---

[1] On January 31, 2022, GlaxoSmithKline Consumer Healthcare Holdings (US) LLC was
substituted into the case as the Defendant in place of Pfizer Inc., which was dismissed from the
case. (ECF No. 66.)

[2] Plaintiff Hinz filed a stipulation of voluntary dismissal pursuant to Fed. R. Civ. P.
41(a)(1)(A)(ii) on June 10, 2022. (ECF No. 79.) In its prior decision, the Court dismissed
Plaintiff de Clue's consumer protection and unjust enrichment claims. *Woodhams v. Pfizer, Inc.*,
No. 18-CV-3990, 2021 WL 5304309, at *4 n.3 (S.D.N.Y. Nov. 15, 2021) (ECF No. 60).

Defendant moves to exclude the opinions of Joel E. Lesch (ECF No. 98).  For the following

reasons, Defendant's motion for summary judgment is granted in part and denied in part, and

Plaintiffs' motion for class certification is denied.

## I.   Background

### A.   Factual Background

The following facts are drawn from Defendant's Local Rule 56.1 Statement (ECF No.

104 ("Def.'s SOF")), Plaintiffs' Response to Defendant's Rule 56.1 Statement (ECF No. 119

("Pls.' SOF Opp.")), Plaintiffs' Rule 56.1 Statement (ECF No. 119 ("Pls.' SOF")), and

Defendant's Response to Plaintiffs' Rule 56.1 Statement (ECF No. 130 ("Def.'s SOF Opp.")).

The facts recited here are undisputed unless otherwise noted, and they are construed in the light

most favorable to Plaintiffs as the nonmovants.

Defendant sells a variety of cough and congestion medications under the Robitussin

brand, including Robitussin Cough+Chest Congestion DM ("Regular Strength Robitussin") and

Maximum Strength Robitussin Cough+Chest Congestion DM ("Maximum Strength

Robitussin").  (Def.'s SOF ¶ 8.)  Throughout the relevant time period, Regular Strength

Robitussin and Maximum Strength Robitussin contained two active ingredients:

dextromethorphan hydrobromide ("DXM Hbr"), a cough suppressant, and guaifenesin, an

expectorant.  (*Id.* ¶ 9.)  Prior to June 2016, both Regular Strength Robitussin and Maximum

Strength Robitussin were sold with a recommended dosage size of 10 ml.  (*Id.*)  A 10 ml dose of

Regular Strength Robitussin contained 20 mg of DXM Hbr and 200 mg of guaifenesin, while a

Maximum Strength Robitussin contained the same amount of DXM Hbr (20 mg) but twice as

much guaifenesin (400 mg).

On June 20, 2016, as a result of "Project Accelerate," Defendant released a reformulated

Maximum Strength Robitussin.  (*Id.* ¶ 18; Def.'s SOF Opp. ¶ 5.)  In its reformulation, Defendant

did not change the quantity of active ingredients per dose but doubled the liquid volume of the dose to a 20 ml dose, which provided more liquid volume per dose.  (Def.'s SOF ¶ 14.)  By doubling the dosage size of Maximum Strength Robitussin (10 ml to 20 ml) but maintaining the level of active ingredients per dose (20 mg of DXM Hbr, 400 mg of guaifenesin), Defendant's reformulation halved the product's concentration of active ingredients.  This meant that after the reformulation, a 10 ml dose of Regular Strength Robitussin contained 20 mg of DXM Hbr and 200 mg of guaifenesin, while a 10 ml dose of Maximum Strength Robitussin contained *half* the amount of DXM Hbr (10 mg) and the same amount of guaifenesin (200 mg).  And, because Regular Strength Robitussin and Maximum Strength Robitussin were sold in bottles of the same size both prior to and after the reformulation, after the reformulation, a bottle of Regular Strength Robitussin had twice as many doses as a bottle of Maximum Strength Robitussin.  Despite this, Defendant charged more for a bottle of Maximum Strength Robitussin than for a bottle of Regular Strength Robitussin.

In the summer of 2018, Defendant reformulated Regular Strength Robitussin by similarly leaving the quantity of active ingredients per dose unchanged, but doubling the liquid volume of the dose from 10 ml to 20 ml.  (Def. SOF ¶ 24.)  Plaintiffs bring claims for purchases of Maximum Strength Robitussin during the time period between June 20, 2016, when Maximum Strength Robitussin was reformulated to a 20 ml dose, and Summer 2018, when Regular Strength Robitussin was also reformulated to a 20 ml dose.

The pertinent figures are summarized in the following table:

| Ingredient/Product | Regular Strength Robitussin (Pre-Summer 2018) | Maximum Strength Robitussin (Pre-June 20, 2016) | Reformulated Maximum Strength Robitussin (Post-June 20, 2016) | Reformulated Regular Strength Robitussin (Post-Summer 2018) |
|---|---|---|---|---|
| **Dextromethorphan per 10 ml** | **20 mg** | 20 mg | **10 mg** | 10 mg |
| **Guaifenesin per 10 ml** | **200 mg** | 400 mg | **200 mg** | 100 mg |
| **Dextromethorphan per 20 ml** | 40 mg | 40 mg | 20 mg | 20 mg |
| **Guaifenesin per 20 ml** | 400 mg | 800 mg | 400 mg | 200 mg |
| **Dextromethorphan per 4 oz bottle** | 236 mg | 236 mg | 118 mg | 118 mg |
| **Guaifenesin per 4 oz bottle** | 2360 mg | 4720 mg | 2360 mg | 1180 mg |

(Def's SOF Opp. ¶ 1.)

When the reformulated Maximum Strength Robitussin was introduced to the market, the front of the product packaging included a "See New Dosing" callout, which remained on the package until early 2018. (Pls.' SOF Opp. ¶¶ 19, 21.) The back of the package included the dosing information, as well we the following statement: "Maximum strength claim based on maximum levels of active ingredients per dose." (*Id.* ¶ 23.) Although the reformulation diluted the concentration of active ingredients in Maximum Strength Robitussin, Defendant maintained the "maximum strength" label on the product—on the theory that a dose of Maximum Strength Robitussin would give a consumer the maximum quantity of DXM Hbr and guaifenesin per dose permitted by applicable U.S. Food and Drug Administration ("FDA") regulations. (Def.'s SOF ¶ 10.) Nothing on the reformulated Maximum Strength Robitussin box referenced or compared the concentration of active ingredients in Regular Strength Robitussin. "Defendant did not intend the 'See New Dosing' reference to have consumers compare Maximum Strength

Robitussin with other Robitussin products in order for the consumer to determine that Maximum

Strength Robitussin contained more or less active ingredients than Regular Robitussin." (Def.'s

SOF Opp. ¶ 30.) Instead, "the purpose of the new dosing flag was for customers to compare the

reformulated [Maximum Strength Robitussin] (20 ml) product with the original [Maximum

Strength Robitussin] (10 ml) product." (*Id.* ¶ 31.) The following images depict the front of the

Maximum Strength Robitussin package before and after the reformulation, as well as the back of

the Maximum Strength Robitussin package after the reformulation:





(Def.'s SOF ¶ 19, 23; Pls.' SOF Opp. ¶ 23.)

Plaintiffs contend that Defendant reformulated Maximum Strength Robitussin in order to

increase the price per dose of Maximum Strength Robitussin. (Def.'s SOF Opp. ¶ 4.) Defendant

denies this, and instead states that it reformulated Maximum Strength Robitussin in order to

"improve[] taste and sensory attributes," including "throat coating and cooling sensations."

(Def.'s SOF ¶¶ 11-12.)  Defendant's internal correspondence and documents related to the development of the reformulation show that Defendant recognized that changing the dosage to 20 ml would cause consumers to go through a bottle of Maximum Strength Robitussin twice as fast, which presented the opportunity for increased repeat purchases.  (*See* Def.'s SOF Opp. ¶¶ 9-20.)  Some of Defendant's employees raised questions about how consumers would react to the decrease in the number of doses per bottle and noted that consumers may become upset.  (*See id.* ¶¶ 21-29.)

Prior to the launch of Maximum Strength Robitussin, Defendant conducted a variety of research regarding Robitussin generally and Maximum Strength Robitussin specifically, including consumer surveys, focus groups, and market research concerning the taste, look, packaging, sensory attributes, dosing, and consumer purchasing drivers of Maximum Strength Robitussin.  (*Id.* ¶ 32.)  As part of this process, Defendant hired third-party consultants to conduct consumer research.  (*Id.* ¶ 33.)  One of the studies explained that "Maximum/severe strength sways quite a few to spend more" and that "[m]aximum strength medication is perceived to work better and provide more value to consumers."  (*Id.* ¶¶ 41, 43.)  Defendant was "aware of some common understandings of the term[] 'maximum strength,'" such as "the strongest medicine [one] can get."  (*Id.* ¶ 37.)  After releasing the reformulated Maximum Strength Robitussin, Defendant received complaints from consumers about the changes to product, including with regard to the smaller number of doses.  (*Id.* ¶ 49.)

At all times relevant to this action, Woodhams was a resident of Michigan, Paul was a resident of Colorado, Trepper was a resident of North Carolina, Utterback was a resident of Missouri, Covello was a resident of New York, and De Leon and Carrillo were residents of California.  (Def's SOF ¶¶ 1-7.)  Plaintiffs contend that they purchased Maximum Strength

Robitussin during the relevant time period between June 20, 2016, and Summer 2018.  (Pls.'
SOF Opp. ¶¶ 25, 29, 41, 58, 68, 75, 83.)  Plaintiffs contend that at the time of their purchases,
they believed that a bottle of Maximum Strength Robitussin had a higher concentration of active
ingredients than a bottle Regular Strength Robitussin and that they stopped purchasing
Maximum Strength Robitussin when they learned that this was not the case.  (Pls.' SOF ¶¶ 55-
61.)

     **B.**     **Procedural History**

     Plaintiffs commenced this action on May 4, 2018.  (ECF No. 4.)  The Court granted in
part and denied in part Defendant's motion to dismiss on November 15, 2021.  *Woodhams v.
Pfizer, Inc.*, No. 18-CV-3990, 2021 WL 5304309 (S.D.N.Y. Nov. 15, 2021) (ECF No. 60).
Plaintiffs filed a motion for class certification and appointment of class counsel on February 10,
2023. (ECF No. 91.)  Defendant filed a motion to exclude the opinions of Joel E. Lesch on
February 10, 2023.  (ECF No. 98.)  Defendant also filed a motion for summary judgment on
February 10, 2023.  (ECF No. 102.)  Plaintiffs filed a response in opposition to Defendant's
motion for summary judgment on March 24, 2023.  (ECF No. 118.)  Defendant filed an
opposition to Plaintiffs' motion for class certification and appointment of class counsel on March
24, 2023.  (ECF No. 123.)  Defendant filed a reply in support of its motion for summary
judgment on April 12, 2023.  (ECF No. 128.)  Defendant also filed a reply in support of its
motion to exclude the opinions of Joel E. Lesch on April 12, 2023.  (ECF No. 129.)  Finally,
Plaintiffs filed a reply in support of their motion for class certification and appointment of class
counsel on April 12, 2023. (ECF No. 131.)

## II.      Defendant's Motion for Summary Judgment

### A.      Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court must grant a motion for summary

judgment "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it

"might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, Inc.,

477 U.S. 242, 248 (1986).  And an issue is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*  Defendant, as the moving party, "has the

burden of demonstrating that no genuine issue of material fact exists."  *EMA Fin., LLC v.*

*Flitways Tech., Inc.*, No. 20-CV-324, 2022 WL 1910078, at *2 (S.D.N.Y. June 3, 2022) (citing

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).  In deciding whether such a

showing has been made, here, the Court resolves all ambiguities and draws all permissible

inferences in favor of Plaintiffs, against whom summary judgment is sought.  *Friend v.*

*Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023).

### B.      Choice of Law Analysis

A federal court exercising diversity jurisdiction must apply the choice of law analysis of

the forum state.  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d

Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487 (1941).  "[T]he first step in

any case presenting a potential choice of law issue is to determine whether there is an actual

conflict between the laws of the jurisdictions involved."  *Id.* (quoting *In re Allstate Ins. Co.,*

*(Stolarz)*, 81 N.Y.2d 219, 223 (1993)).  An actual conflict is present "[w]here the applicable law

from each jurisdiction provides different substantive rules."  *Curley v. AMR Corp*., 153 F.3d 5,

12 (2d Cir. 1998).  Plaintiffs bring consumer protection and unjust enrichment claims under the

laws of their home states.  "Most of the courts that have addressed the issue have determined that

the consumer-fraud . . . laws in the fifty states differ in relevant respects." *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) (collecting cases). "Likewise, several courts have determined that the states' unjust-enrichment laws vary in relevant respects." *Id.* (collecting cases).

Because there are relevant conflicts in the states' consumer-fraud and unjust-enrichment laws, the Court must proceed to the second step of the choice-of-law inquiry. "With respect to the [P]laintiffs' claims for consumer fraud, which sound largely in tort, the Court must determine which jurisdiction has the greatest interest in this litigation." *Id.* at 148 (citing *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir.2006)). Because Plaintiffs' claims for unjust enrichment rest upon the Defendant's fraudulent conduct, the claims sound in the tort of fraud, and thereby also necessitate a torts conflicts analysis. *See id.*; *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 352 (E.D.N.Y. 2016). "In tort cases where conduct-regulating standards are at issue, courts generally apply the law of the state where the tort occurred, as that state usually has the greatest interest at stake in the litigation." *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. at 149 (citing *GlobalNet Financial.Com, Inc.*, 449 F.3d at 384).

Here, for purposes of conducting the interest analysis, Defendant's alleged fraud occurred in the state where each Plaintiff purchased a bottle of Maximum Strength Robitussin. *Id.* Although Plaintiffs contend that Defendant's scheme to reformulate and market Maximum Strength Robitussin may have been conceived in New Jersey (ECF No. 118 at 7), the actual deception occurred at the time that each Plaintiff purchased a bottle of Maximum Strength Robitussin. *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. at 149 (citing *Goshen v. Mut. Life. Ins. Co.*, 98 N.Y.2d 314, 325-26, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (N.Y.

2002) (finding that deception took place in state where plaintiffs purchased insurance policies, not in New York, where the alleged fraudulent scheme was designed)).  The interest analysis favors the application of the consumer protection and unjust enrichment laws of the state in which each Plaintiff purchased a bottle of Maximum Strength Robitussin.

### C.    Plaintiffs' Consumer Protection and Unjust Enrichment Claims

#### 1.    Whether Plaintiffs Carrillo, De Leon, Trepper, Utterback, and Covello Purchased Maximum Strength Robitussin During the Time Period of Alleged Deception

Defendant moves for summary judgment on the consumer protection claims alleged by Carrillo, De Leon, Trepper, Utterback and Covello, and the unjust enrichment claims alleged by Carrillo, De Leon, Trepper, and Utterback, on the basis that none of these five Plaintiffs has produced evidence that they purchased Maximum Strength Robitussin during the relevant time period between June 20, 2016, when Maximum Strength Robitussin was reformulated to a 20 ml dosage size, and summer 2018, when Regular Strength Robitussin was reformulated to the same 20 ml dosage size.  (ECF No. 103 at 7.)  "In order to maintain a cause of action" under the consumer fraud statutes of California, North Carolina, Missouri, and New York, "a plaintiff must show . . . that the plaintiff was injured by [the deceptive] practice."  *Bibicheff v. PayPal, Inc.*, 844 F. App'x 394, 396 (2d Cir. 2021) (summary order) (internal citation and quotation marks omitted); *see also Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1112 (N.D. Cal. 2016); *White v. Just Born, Inc.*, No. 17-CV-04025, 2018 WL 3748405, at *3 (W.D. Mo. Aug. 7, 2018); *Belcher v. Fleetwood Enters., Inc.*, 590 S.E.2d 15, 19 (N.C. Ct. App. 2004).  Plaintiffs similarly must have suffered the injury to maintain their unjust enrichment claims.  *See Jafari v. F.D.I.C.*, No. 12-CV-2982, 2015 WL 3604443, at *5 (S.D. Cal. June 8, 2015); *Stockdall v. TG Invs., Inc.*, 129 F. Supp. 3d 871, 880 (E.D. Mo. 2015); *Effler v. Pyles*, 94 N.C. App. 349, 353, 380 S.E.2d 149, 152 (1989).

Defendant contends that these five Plaintiffs failed to produce evidence showing that they purchased Maximum Strength Robitussin during the relevant time period, and thus, that these Plaintiffs cannot establish a genuine dispute of material fact as to whether they purchased Maximum Strength Robitussin during the relevant time period, thereby making summary judgment appropriate.  In particular, Defendant states that these Plaintiffs did not produce a receipt showing a purchase of Maximum Strength Robitussin, and their store loyalty accounts do not reflect a purchase of Maximum Strength Robitussin in the relevant time period.  (ECF No. 103 at 8.)  In response, Plaintiffs contend that they provided sworn interrogatory responses and deposition testimony stating that they purchased Maximum Strength Robitussin during the relevant time period.  (ECF No. 118 at 8-11.)  Defendant responds that Plaintiffs' deposition testimony was so "riddled with inconsistencies and illogical statements" that it should not be credited.  (ECF No. 103 at 8.)

*Cynthia Carrillo*.  In her interrogatory responses, Carrillo attested that she purchased Maximum Strength Robitussin in "October or November of 2016" at Rite Aid.  (SUMF ¶ 58.)  In her deposition testimony, Carrillo initially testified that she was "certain" she purchased Maximum Strength Robitussin instead of Regular Strength Robitussin on that date.  (ECF No. 105-27 ("Carrillo Dep.") at 154:4-5.)  When she was asked how she could be certain that she purchased Maximum Strength Robitussin instead of Regular Strength Robitussin, Carrillo stated that "if it was on the shelf and it was [Maximum Strength Robitussin], [she] would have gone for the [Maximum Strength Robitussin]," but she did not know whether Maximum Strength Robitussin was in fact on the shelf on the day of her purchase.  (*Id.* at 154:6-12.)  Carrillo does not have a receipt from the transaction, and her Rite Aid loyalty account records do not show a purchase for any Robitussin product around that time.  (Pls.' Opp. SOF ¶ 59.)  However, Carrillo

clarified that while she does "typically" use her loyalty account when shopping at Rite Aid and CVS, sometimes she is "in a hurry and just [does not] want to bother." (*Id.*; Carrillo Dep. at 43:3-9.)

*Oscar De Leon*. In his interrogatory responses, De Leon attested that he purchased a single bottle of Maximum Strength Robitussin in June 2017 from Rite Aid. (Pls.' Opp. SOF ¶¶ 41- 42.) In his deposition testimony, De Leon testified that he purchased the bottle of Maximum Strength Robitussin in June 2017, and testified that he recalled purchasing a second bottle of Maximum Strength Robitussin after June 2017, which he did not recall at the time he completed his interrogatory responses. (ECF No. 105-1 ("De Leon Dep.") at 37:1-13, 54:18-55:18.) De Leon does not have a receipt or any other physical evidence of that purchase. (Pls.' Opp. SOF ¶ 43.)

*Robert Trepper*. In his interrogatory responses, Trepper attested that he purchased Maximum Strength Robitussin in spring 2017 at Walgreens. (Pls.' Opp. SOF ¶ 75.) In his deposition testimony, he testified that he purchased the bottle of Maximum Strength Robitussin in spring 2017. (ECF No. 105-32 ("Trepper Dep.") at 49:9-11.) Trepper does not have a receipt of that purchase, and his Walgreens loyalty account does not show any purchase of Maximum Strength Robitussin in 2017. (Pls.' Opp. SOF ¶¶ 76-77.) However, Trepper clarified that while he "probably" uses his loyalty account "most of the times" he shops at Walgreens, sometimes he does not if he is "in a hurry" or "forgets." (*Id.* ¶ 77; Trepper Dep. at 26:17-22, 27:1-3.) He testified that he did not remember using his loyalty account when he purchased the Maximum Strength Robitussin. (Pls.' Opp. SOF ¶ 77; Trepper Dep. at 50:2-9.)

*Daniel Utterback*. In his interrogatory responses, Utterback attested that he purchased a bottle of Maximum Strength Robitussin in fall 2016 from Walmart. (Pls.' Opp. SOF ¶ 83; ECF

No. 105-35 ("Utterback Dep.") at 106:13-16.)  During his deposition, Utterback initially testified that he had only purchased cough medicine from Walmart "[o]ne time" in 2018 or 2019 when he purchased store-brand Equate brand cough medicine, but after being shown his interrogatory responses, Utterback testified that he purchased Maximum Strength Robitussin at Walmart in 2016.  (Pls. Opp. SOF ¶¶ 86-87; Utterback Dep. at 39:20-40:15, 101:9-103:20.)  Utterback does not have a receipt for the purchase, and his Walmart loyalty account does not reflect the purchase of Maximum Strength Robitussin.  (Pls.' Opp. SOF ¶¶ 88-89.)  Utterback testified that he did not use his loyalty card when making the purchase because he "was in a hurry."  (*Id.* ¶ 89; Utterback Dep. at 103:13-20.)

*John Covello*.  In his interrogatory responses, Covello attested that he purchased three bottles of Maximum Strength Robitussin in 2017.  (Pls.' Opp. SOF ¶ 29.)  First, he testified that he "purchased [Maximum Strength Robitussin] . . . [a]t least twice" in 2015—prior to the start of the relevant time period—and could not recall purchasing any Robitussin product after that.  (*Id.* ¶ 30; ECF No. 105-22 ("Covello Dep.") at 53:7-54:4.)  Covello was subsequently shown the allegation in his Complaint that he "purchased a total of three bottles of [Maximum Strength Robitussin]" in 2017, at which point he admitted that he was "not 100 percent sure" when he purchased Maximum Strength Robitussin.  (Pls.' Opp. SOF ¶ 31; Covello Dep. 143:20-145:14.)  Covello then concluded that "2017 is more likely correct," but admitted that he is "not certain" when he purchased Maximum Strength Robitussin, and "the only reason . . . why [he] think[s] it was 2017" is because he was shown the Complaint.  (Pls.' Opp. SOF ¶ 33; Covello Dep. at 145:11-14, 147:21-148:14).  Ultimately, at the time of his deposition, Covello stated that he had "more of a degree of certainty" that he made these purchases in 2017.  (Pls.' Opp. SOF ¶¶ 31-33; Covello Dep. at 147:1-8.)  Covello's store loyalty account does not reflect any purchase of a

Robitussin product in 2015 or 2017, but Covello clarified that "sometimes [when he is] just getting a few things" he does not use his account.  (Pls.' Opp. SOF ¶ 34; Covello Dep. 21:9-19.) He uses his loyalty card "usually when [he is] trying to buy something on sale," which is about "80 percent" of the time.  (Pls.' Opp. SOF ¶ 34; Covello Dep. 21:9-19.)

Defendant contends that Plaintiffs' testimony regarding whether they purchased Maximum Strength Robitussin during the relevant time period should not be credited because the testimony is inconsistent.  A district court may disregard plaintiffs' testimony at the summary judgment stage only "where it is 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in [the] complaint.'"  *Matheson v. Kitchen*, 515 F. App'x 21, 23 (2d Cir. 2013) (summary order) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (reversing district court's grant of summary judgment based on purportedly inconsistent evidence).  Here, some of the Plaintiffs' testimony does contain inconsistencies and uncertainty as to whether they purchased Maximum Strength Robitussin during the relevant time period.  However, De Leon, Trepper, Utterback, and Covello ultimately testified in their depositions that they did purchase Maximum Strength Robitussin during the relevant time period.  To the extent that these Plaintiffs' deposition testimony is inconsistent, it does not rise to the level their testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint."  *Jeffreys*, 426 F.3d at 555.  These Plaintiffs' claims do not fit "among the extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility."  *Matheson*, 515 F. App'x at 24 (internal citation and quotation omitted).  Carrillo, however, could testify only hypothetically that "*if*" Maximum Strength Robitussin was on the shelf on the day of her

purchase, then she would have bought it.  She could not testify that Maximum Strength Robitussin was in fact on the shelf on the day of her alleged purchase.  (*Id.*)  The Court concludes that such ambiguous and uncertain testimony is insufficient to permit a reasonable factfinder to find by a preponderance of the evidence that Carrillo purchased Maximum Strength Robitussin during the relevant time period.

Defendant further contends that Plaintiffs' testimony should not be credited because Plaintiffs have failed to produce receipts reflecting their purchases of Maximum Strength Robitussin during the relevant time period.  Plaintiffs are not necessarily required to produce such receipts.  Courts in this Circuit have recognized that "consumers are likely to lack proof of purchase," *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015), and a "requirement that consumers retain receipts for . . . sundries in order to bring a cause of action would undermine the ability of consumers to bring small item actions," *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 65 (E.D.N.Y. 2015).  Defendant also contends that Plaintiffs' testimony should not be credited because Plaintiffs' store loyalty accounts do not reflect their purchases of Maximum Strength Robitussin during the relevant time period.  However, these Plaintiffs all testified that they do not always use their store loyalty accounts.

Resolving all ambiguities and drawing all permissible inferences in favor of Plaintiffs, genuine issues of material fact exist regarding whether Covello, De Leon, Trepper, and Utterback purchased Maximum Strength Robitussin during the relevant time period.  However, for the reasons discussed above, Carrillo's testimony is insufficient for a reasonable factfinder to find by a preponderance of the evidence that Carrillo purchased Maximum Strength Robitussin during the relevant time period.  Defendant's motion for summary judgment against Carrillo on

this basis is granted.  Defendant's motion for summary judgment against Covello, De Leon,

Trepper, and Utterback on this basis is denied.

> ### 2.    Whether Plaintiffs Covello, De Leon, Utterback, Woodhams, and Paul Were Deceived by the "Maximum Strength" Label

Defendant also moves for summary judgment on the consumer protection claims alleged

by Covello, De Leon, Utterback, Woodhams, and Paul, and the unjust enrichment claims of De

Leon and Utterback, on the basis that these five Plaintiffs were not deceived by the "maximum

strength" packaging label.  The consumer fraud statutes of California, Colorado, Michigan,

Missouri, and New York all define a deceptive act using an objective "reasonable consumer" or

"likely to mislead" test.  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) ("Claims

under the [California Consumer Legal Remedies Act and California Unfair Competition Law]

are governed by the 'reasonable consumer' test. Under this standard, Plaintiff must show that

members of the public are likely to be deceived.  This requires more than a mere possibility that

[the] label might conceivably be misunderstood by some few consumers viewing it in an

unreasonable manner.  Rather, the reasonable consumer standard requires a probability that a

significant portion of the general consuming public or of targeted consumers, acting reasonably

in the circumstances, could be misled.") (internal citations and quotation marks omitted); *Rhino*

*Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 (Colo. 2003) ("[A]

plaintiff may satisfy the deceptive trade practices requirement of [the Colorado Consumer

Protection Act] by establishing either a misrepresentation or that the false representation had the

capacity or tendency to deceive, even if it did not."); *Speerly v. Gen. Motors*, LLC, 343 F.R.D.

493, 520-21 (E.D. Mich. 2023) ("[S]tatutory consumer fraud claims [under the Michigan

Consumer Protection Act] turn[] on consideration of the mindset of an objectively reasonable

consumer."); *Webb v. Dr Pepper Snapple Grp., Inc.*, No.17-CV-00624, 2018 WL 1955422, at *3

(W.D. Mo. Apr. 25, 2018) ("Whether the conduct alleged is deceptive under the [Missouri Merchandising Practices Act] is to be analyzed under the 'reasonable consumer' standard."); *Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015) ("As for the materially misleading prong [of the New York Consumer Protection from Deceptive Acts and Practices law], the New York Court of Appeals has adopted an objective definition of misleading, under which the alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances.") (internal citations and quotation marks omitted).

In ruling on Defendant's motion to dismiss, this Court previously concluded that it is "at least plausible that a reasonable consumer would not expect that a product is fairly represented as 'Maximum Strength,' and is properly priced higher than its 'Regular Strength' cousin, if the consumer gets more of its active ingredients only by consuming more of it." *Woodhams*, 2021 WL 5304309, at *3. Defendant now moves for summary judgment on the claims of these five Plaintiffs on the ground that during their depositions, when these Plaintiffs were asked whether they would consider a dose of Maximum Strength Robitussin to be "maximum strength" if it contained the maximum quantity of active ingredients per dose permitted by the FDA, and Plaintiffs responded affirmatively.[3] In response, Plaintiffs state that Covello, De Leon,

---

[3] Pls.' SOF Opp. ¶ 38; Covello Dep. at 154:4-8 ("Q. If a single dose of [Maximum Strength Robitussin] contains the maximum amount of active ingredients permitted by FDA regulations, would you consider that product to be maximum strength? A. Yes."). Pls.' SOF Opp. ¶ 52; De Leon Dep. at 32:10-33:3("Q. If a dose of [Maximum Strength Robitussin] contained the maximum amount of active ingredients allowed by law, would you believe that you were deceived? . . . A. If it actually contained it, no."). Pls.' SOF Opp. ¶ 91; Utterback Dep. at 137:15-19 ("Q. So if a product labeled as "maximum strength" had the maximum amount of active ingredients per dose allowed by the FDA, that would not be deceptive? A. It would not."). Pls.' SOF Opp. ¶ 27; ECF No. 105-18 ("Woodhams Dep.") at 132:7-10 ("Q. Okay. What does the term 'maximum strength' mean to you, Mr. Woodhams? A. To me it means the maximum strength they can sell me over the counter."). Pls.' SOF Opp. ¶ 70; ECF No. 105-30 ("Paul Dep.") at 50:16-51:2 ("Q. Okay. What do you think maximum strength means? . . . A: That it

Woodhams, and Paul all also testified that they believed that Maximum Strength Robitussin had a "higher concentration of active ingredients" than Regular Strength Robitussin.[4]  And Utterback testified that he believed that Robitussin lied to him because Maximum Strength Robitussin was supposed to be maximum strength and "[i]t wasn't."[5]  However, Defendant contends that upon further questioning, at least three of these Plaintiffs stated that they interpreted the "concentration of active ingredients" to refer to the dosage, not the bottle.[6]

Defendant's reliance on these isolated answers to deposition questions fails to undermine Plaintiffs' claims for purposes of summary judgment.  Indeed, Plaintiffs' confusion is understandable, and illustrative of how a reasonable consumer might interpret the "maximum strength" label.  Prior to the reformulation, a bottle of Maximum Strength Robitussin would be "maximum strength" in both Plaintiffs' and Defendant's terms: it would be both the maximum quantity of active ingredients per dosage, and the maximum concentration of active ingredients per bottle.  After the reformulation, given that the two bottles are the same size, in order for Plaintiffs—or any consumer—to understand that "maximum strength" referred *only* to the dose,

---

will have—the maximum strength that will be allowed . . . by the FDA for treating that particular ailment.")

[4] Pls.' SOF ¶ 56; Covello Dep. at 181:21-182:9. Pls.' SOF ¶ 57; De Leon Dep. at 136:16-137:5. Pls.' SOF ¶ 55; Woodhams Dep. at 166:17-167:8. Pls.' SOF ¶ 59; Paul Dep. at 167:20-168:7.

[5] Pls.' SOF ¶ 61; Utterback Dep. at 73:7-18.

[6] Def.'s SOF Opp. ¶ 56; Covello Dep. 183:3-12 ("Q: [Plaintiffs' counsel] just referred to a higher concentration of active ingredients . . . does that mean more—than the regular strength version per dose? A: More per dose, yes.").  Def.'s SOF Opp. ¶ 61; Utterback Dep. at 73:15-74:1 ("A: It was supposed to be maximum strength and it wasn't. Q: What do you understand the term 'maximum strength' to mean as used with respect to over-the-counter cough medication? A: The strongest dose available without a prescription.").  Def.'s SOF Opp. ¶ 57; De Leon Dep. at 138:19-139:5 ("Q: Can you explain what the word 'concentration' means in this context, in the context used by your lawyer in his question? A: The amount of those active ingredients that the bottle would—would have had, the dosage would contain.").

and *not also* to the fact that the bottle of Maximum Strength Robitussin contained the maximum concentration of active ingredients compared to the bottle of Regular Strength Robitussin, a consumer would have to pick up both bottles, compare the number of doses in each bottle, and calculate each bottle's concentration of DXM Hbr and guaifenesin per ml.  "[I]t is not reasonable to expect a consumer to cross-check a product's ingredient list against another product's list and then perform arithmetic to make sure she is comparing equivalent dosage volumes, all to ensure that the product she intends to purchase has the qualities it purports to have."  *Al Haj v. Pfizer Inc.*, No. 17-CV-6730, 2019 WL 3202807, at *5 (N.D. Ill. July 16, 2019) (internal citations and quotations omitted).  "And by placing a prominent 'Maximum Strength' designation on what otherwise was materially the same frontside packaging as Regular Strength Robitussin, [Defendant] invited consumers viewing both products to assume that a more expensive bottle of Maximum Strength Robitussin had a greater concentration of active ingredients than the bottle of Regular Strength Robitussin."  *Id.*  A reasonable consumer comparing the two bottles of the same size would "conclude that she was being charged more for a bottle of Maximum Strength Robitussin than she would have paid for a bottle of Regular Strength Robitussin because the former had more potency per volume than the latter."  *Id.*

In addition to Plaintiffs' deposition testimony, Plaintiffs also rely on Defendant's internal documents pertaining to Defendant's pre-launch research, including consumer surveys, focus groups and market research.  As discussed above, Defendant analyzed how consumers would interpret the "maximum strength" label, and it understood that the label "sways quite a few to spend more" and that "[m]aximum strength medication is perceived to work better and provide more value to consumers."  (Def. Opp. SOF ¶¶ 41, 43.)  Defendant was "aware of some common understandings of the term[] 'maximum strength,'" such as "the strongest medicine [one] can

get." (*Id.* ¶ 37.)  A consultant study reported that a consumer interpretation of "maximum strength" is that it "gives you the most bang for the buck."  (*Id.* ¶ 40.)

Considering Plaintiffs' deposition testimony alongside Defendant's internal documents, the Court concludes that Plaintiffs have adduced sufficient evidence to support a jury finding that a reasonable consumer would interpret the "Maximum Strength" label as a representation about the concentration of active ingredients in the bottle of Maximum Strength Robitussin.  The Court thus denies Defendant's motion for summary judgment on this basis.

> **3.  Whether Plaintiffs De Leon, Utterback, Covello, Paul, and Trepper Can Prove that the Alleged Deception Caused them to Purchase Maximum Strength Robitussin**

Finally, Defendant moves for summary judgment on the consumer protection claims of De Leon, Utterback, Covello, Paul, and Trepper, as well as the unjust enrichment claims of De Leon, and Utterback, and Trepper, on the basis that these Plaintiffs cannot prove causation. (ECF No. 103 at 16.)  Defendant contends that if these Plaintiffs were aware of the dosage size or purchased Maximum Strength Robitussin for reasons unrelated to its concentration of active ingredients, they cannot prove that the alleged deception motivated their purchases.  (*Id.*) Furthermore, Defendant contends that if Plaintiffs lack evidence that they had the option to purchase Regular Strength Robitussin, they cannot show that they were misled into paying a premium for Maximum Strength Robitussin instead of the less expensive bottle of Regular Strength Robitussin.  (*Id.* at 16-17.)

First, Defendant contends that De Leon and Utterback testified in their depositions that they would have read the dosing instructions on the bottle of Maximum Strength Robitussin before purchasing it and were therefore aware of the dosage size.[7]  (ECF No. 103 at 16.)  Even if

---

[7] Pls.' SOF Opp. ¶¶ 53-54; De Leon Dep. 38:19-39:1, 41:20- 42:5 (When asked "whether [he] checked the dosing instructions for [Maximum Strength Robitussin] before purchasing it,"

these Plaintiffs did read the dosing instructions before purchasing Maximum Strength Robitussin—which is not certain—they would not be able to obtain all relevant information from just the label of Maximum Strength Robitussin bottle.  Instead, as discussed above, these Plaintiffs would have had to pick up both a bottle of Regular Strength Robitussin and a bottle of Maximum Strength Robitussin, compare the number of doses in each bottle, and calculate each bottle's concentration of DXM Hbr and guaifenesin per ml.  Each of the cases that Defendant cites to argue to the contrary (ECF No. 103 at 17, 19) is inapposite, as the product labels in those cases contained all the information a reasonable customer would need, without needing to refer to the label of a second product and compare two labels.

Second, Defendant contends that Covello and Paul testified that they purchase medicine with a "maximum strength" label because they want the strongest dose possible, not because they want a higher concentration of active ingredients.[8]  (ECF No. 103 at 16.)  Defendant contends that such testimony establishes that Covello and Paul would not have purchased Regular Strength Robitussin over Maximum Strength Robitussin even if they had been aware of the concentration of active ingredients in each bottle because they would never have purchased Regular Strength Robitussin in the first place.  In other words, according to Defendant, Covello and Paul wanted to purchase a product with the maximum quantity of active ingredients per *dose*

---

De Leon testified that he "assume[s] so." Additionally, De Leon admitted that if he saw a callout on a box of medicine that said "See New Dosing"—he would "[r]ead the box" and "[r]ead the dosage" before purchasing the product).  Pls.' SOF Opp. ¶ 90; Utterback Dep. 27:3-11 (Utterback admitted that if he "were considering buying an over-the-counter cough syrup, and the front of the package included a label that said 'See New Dosing,'" he would "look at the dosing information before buying it").

[8] Pls.' SOF Opp. ¶ 35; Covello Dep. 34:10-16 (Covello testified that, when shopping for cold medication, he would generally "look for extra strength . . . because [he's] a big person and [he] just want[s] to take a standard dose of that").  Pls.' SOF Opp. ¶ 72; Paul Dep. 138:10-16 ) (Paul testified that he "always buy[s] maximum strength of all . . . the over-the-counter medications").

available, irrespective of the concentration of active ingredients per *bottle*, and that is what they got when they purchased Maximum Strength Robitussin.  For the reasons discussed above, this argument fails to undermine Plaintiffs' claims so as to warrant summary judgment.

Third, Defendant contends that Paul and Trepper do not have evidence that they had the option to purchase Regular Strength Robitussin instead of Maximum Strength Robitussin.[9] (ECF No. 103 at 16.)  According to Defendant, if these Plaintiffs never had the option to purchase Regular Strength Robitussin in the first place, the deception could not have caused their injury.  (*Id.* at 21–22.)  Defendant's argument is unavailing.  Even assuming that Paul and Trepper did not have the choice to purchase Regular Strength Robitussin, it is possible that in the absence of the availability of Regular Strength Robitussin, but for the "maximum strength" label, Paul and Trepper would not have purchased Maximum Strength Robitussin at the higher price. Plaintiffs could have chosen to look for Regular Strength Robitussin at another store or purchase a different brand of cough syrup.  "[T]o establish proximate causation, [Plaintiffs] need only show that [they were], in some manner, deceived by [Defendant's] misrepresentation.  Thus, to survive summary judgment, [Plaintiffs] need only set forth sufficient evidence creating a genuine issue of material fact that 'but for' [Defendant's] . . . conduct, [they] would not have . . . purchased [Maximum Strength Robitussin] at artificially inflated prices."  *Al Haj v. Pfizer Inc.*, 2019 WL 3202807, at *8 (internal citation and quotation marks omitted).

---

[9] Pls.' SOF Opp. ¶ 69; Paul Dep. 168:12-18 (At his deposition, Paul admitted that he did not "recall anything about [his] purchase of [Maximum Strength Robitussin] in 2016 other than the fact that it occurred" and therefore cannot say if Robitussin DM was even sold at the store where he purchased Regular Strength Robitussin).  Pls.' SOF Opp. ¶ 80; Trepper Dep. 52:12-15 (Trepper admitted in his deposition that he has no idea "if Robitussin DM . . . was also available at Walgreens in spring 2017" when he purchased DM Max).

In sum, a reasonable jury on this record could find that Defendant's "Maximum Strength" label deceived Plaintiffs into purchasing and overpaying for Maximum Strength Robitussin. Plaintiffs' consumer protection and unjust enrichment claims thus survive summary judgment.

## III.    Plaintiffs' Motion for Class Certification

### A.    Legal Standard

In order to qualify for class certification, Plaintiffs must demonstrate that their proposed class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  "A class may be certified only if, 'after a rigorous analysis,' the . . . court is satisfied that the prerequisites of [Rule 23(a)] are met." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).  Assuming the requirements of Rule 23(a) are met, Plaintiffs must then establish that certification is appropriate for one of the three reasons set forth in Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(3), which authorizes class certification if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Rule 23 does not set forth a mere pleading standard," rather, the party "seeking class certification must affirmatively demonstrate [its] compliance with the Rule—that is, [it] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted) (emphasis in original).  "The party seeking class certification bears the burden of establishing by a

preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

### B.      Discussion

The Court first assesses whether Plaintiffs have met their burden to establish the four requirements under Rule 23(a).  Defendant contends that Plaintiffs cannot meet the typicality or adequacy requirements because they are subject to "unique defenses" that "threaten to become the focus of the litigation."  *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) (internal citations omitted).

"When defendants argue that unique defenses apply to the putative class representative, courts analyze the issue under either the typicality or adequacy prongs of Rule 23(a)."  *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 338 (S.D.N.Y. 2021), *leave to appeal denied*, No. 21-CV-1234, 2021 WL 5443265 (2d Cir. Sept. 16, 2021).  "The Second Circuit has instructed that 'the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification . . . [but] class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'"  *Bowling*, 2019 WL 1760162, at *4 (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (abrogated on other grounds)).  "The relevant inquiry at this stage is whether any unique defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members."  *Id.* (internal citations and quotation marks omitted); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").  "The Court need not resolve whether a unique defense would ultimately succeed on the merits; rather, certification must be refused if the Court is 'confronted with a sufficiently

clear showing of the defense's applicability to the representative plaintiff.'" *Bowling*, 2019 WL 1760162, at *4 (internal citations and quotation marks omitted).  However, "the typicality and adequacy requirements may be met if the proffered unique defenses 'seem to rest on little more than speculation.'"  *Id.* (internal citations and quotation marks omitted).  In addition, courts decline to allow a proposed class representative who has "repeatedly given false or contradictory testimony . . . [to serve] as class plaintiff because the credibility of the plaintiff 'will become the focus of cross-examination at trial, impeding her ability to effectively represent the class.'" *Garcia De Leon v. New York Univ.*, No. 21-CV-05005, 2022 WL 2237452, at *14 (S.D.N.Y. June 22, 2022) (citing *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. 2010)).

Defendant contends that Plaintiffs' claims are subject to several unique defenses related to the issues Defendant raised in its motion for summary judgment.  (ECF No. 123 at 27.) Although the Court has already denied Defendant's motion for summary judgment as to Covello, De Leon, Paul, Trepper, Utterback, and Woodhams,[10] at the class certification stage, the relevant inquiry is not whether Plaintiffs could prevail at trial; rather, the relevant inquiry is whether Plaintiffs will fairly and adequately protect the interests of the class, or whether unique defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members.

Most critically, Defendant contends that De Leon, Trepper, Covello, and Utterback lack evidence that they purchased Maximum Strength Robitussin during the relevant time period and offered contradictory and inconsistent deposition testimony as to when and how many times they

---

[10] The Court does not address Defendant's Rule 23(a) typicality and adequacy arguments with regard to Carrillo as the Court has already granted Defendant's motion for summary judgment as to Carrillo's claims.

purchased Maximum Strength Robitussin. (ECF No. 123 at 28.) As discussed above, these Plaintiffs have not offered receipts reflecting their purchases of Maximum Strength Robitussin, and their purchases are not reflected on the store loyalty accounts of the Plaintiffs that regularly use store loyalty accounts. Defendant has "raised credible concerns about the central factual predicate of [Plaintiffs'] claim—that [they] purchased [Maximum Strength Robitussin] during the relevant period." *Bowling*, 2019 WL 1760162, at *7. "These defenses are 'meritorious enough to require [Plaintiffs] to devote considerable time' to rebut them." *Id.* (citing *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008)). The obstacle posed by Plaintiffs' lack of proof of purchase to their success at trial would not stand in the way of a putative class member who did have proof of purchase. Class certification is inappropriate where, as here, "[a]n inquiry into [Plaintiffs'] exposure to the product and [their] veracity—given the apparent inconsistencies between [their] deposition[s] and [interrogatory responses]—threaten[s] to become the focus of the litigation in the sense that Defendant[] would seek to highlight these discrepancies and causation issues, which are unique to [Plaintiffs]." *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11-CV-6546, 2013 WL 93636, at *6 n.3 (S.D.N.Y. Jan. 9, 2013) (internal citation and quotation marks omitted).

Defendant further contends that Plaintiffs Trepper and De Leon are inadequate class representatives due to their inconsistent testimony regarding their cough medicine purchases, raising serious doubts about their credibility and veracity. (ECF No. 123 at 29-30.) "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998); *see also Bowling*, 2019 WL 1760162, at *6 ("The credibility of a plaintiff can be considered in a motion for class certification.") (internal citations and quotation marks omitted). Defendant points to the

fact that Trepper claimed to remember purchasing Maximum Strength Robitussin during the relevant time period even though he had no memory of any other cough medicine purchases, including those that were in fact documented on his store loyalty account.  (Def.'s SOF ¶ 78.) Defendant also points to the fact that Trepper claimed he paid approximately $40 for a single bottle of Maximum Strength Robitussin.  (*Id.* ¶ 81.)  With regard to De Leon, Defendant points to the fact that De Leon's deposition contained several inconsistencies regarding the number of times he purchased Maximum Strength Robitussin and repeated assertions that he purchased cough medicine in response to the COVID-19 pandemic in November 2019—a month before the first case of COVID-19 in the world was reported in December 2019.  (*Id.* ¶¶ 49-51.)  These Plaintiffs' inconsistent testimony about their cough medicine purchases "would create serious concerns as to [their] credibility at any trial."  *Savino*, 164 F.3d at 87.

In addition, Defendant contends that Covello, De Leon, Utterback, Woodhams, and Paul all testified that they understood the "maximum strength" label to mean that a *dose* of Maximum Strength Robitussin contained the highest possible concentration of active ingredients.[11]  Covello and Paul also testified that they purchase medicine with a "maximum strength" label because they want the strongest dose possible.[12]  If Plaintiffs did not purchase Maximum Strength Robitussin believing that the bottle had a higher concentration of active ingredients than Regular Strength Robitussin, a jury could find that there was no causal connection between Defendant's alleged misrepresentation and Plaintiffs' purchase of Maximum Strength Robitussin.  The "obstacle posed by [Plaintiffs'] deposition testimony to [their] success at trial would not stand in the way of a putative class member who purchased Maximum Strength Robitussin with the belief

---

[11] *See supra* note 3 and accompanying text.

[12] *See supra* note 8 and accompanying text.

that the product had a higher concentration of active ingredients" per bottle and who offered consistent, credible testimony as to the same. *Al Haj v. Pfizer Inc.*, No. 17-CV-6730, 2020 WL 1330367, at *3 (N.D. Ill. Mar. 23, 2020).

Plaintiffs do little to refute Defendant's arguments that these unique defenses defeat Plaintiffs' adequacy as class representatives. (*See* ECF No. 131 at 2-3.) In response to Defendant's specific arguments, Plaintiffs state that: Plaintiffs bought Maximum Strength Robitussin during the relevant time period; Plaintiffs testified that that they believed that a bottle of Maximum Strength Robitussin had a higher concentration of active ingredients than a bottle of Regular Strength Robitussin;[13] and Defendant is merely "rehash[ing]" summary judgment arguments. (*Id.* at 3.) These arguments fail to persuade as they go to Plaintiffs' ability to prevail at trial, but not to Plaintiffs' adequacy as class representatives.

The Court concludes that Plaintiffs would have to devote substantial attention to overcoming their damaging deposition testimony and addressing concerns regarding their credibility on material facts, including whether they even purchased Maximum Strength Robitussin during the relevant time period. Taken together, these issues render Plaintiffs inadequate class representatives. The Court thus concludes that the Rule 23(a) prerequisites are not met, and therefore that Plaintiffs' motion for class certification must be denied. Accordingly, the Court does not reach the question of whether Plaintiffs have met the Rule 23(b) requirements.

---

[13] *See supra* note 4 and accompanying text.

**IV.      Conclusion**

For the foregoing reasons: Defendant's motion for summary judgment is GRANTED in part and DENIED in part; Plaintiffs' motion for class certification and appointment of class counsel is DENIED; Defendant's motion to exclude the opinions of Joel E. Lesch is DENIED as moot; Defendant's motion to strike Plaintiff's offer of proof is DENIED as moot.

The Clerk of Court is directed to close the motions at ECF Nos. 91, 98, 102, and 109.

SO ORDERED.

Dated:  March 21, 2024
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge